[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13869

_____

WILLIAM JENKINS,

Plaintiff-Appellant,

*versus*

KARL NELL,
In his Individual Capacity,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:19-cv-00002-WTM-BKE

_____

Before WILSON, LAGOA, Circuit Judges, and MARTINEZ,* District Judge.

WILSON, Circuit Judge:

William Jenkins sued Karl Nell for race discrimination after Nell terminated Jenkins. Jenkins appeals the district court's entry of summary judgment in favor of Nell. The district court found that Jenkins failed to present a prima facie case of race discrimination and failed to show that Nell's reason for Jenkins's termination was pretextual. The district court also concluded that Jenkins failed to present sufficient evidence to establish a convincing mosaic of discrimination to survive summary judgment. After careful review and with the benefit of oral argument, we reverse.

## I.        BACKGROUND

Jenkins, a white male, worked at the Georgia Ports Authority (GPA) as a crane operator. Nell, a black male, was Jenkins's supervisor.

The following facts are undisputed. In December 2016, a crane that Jenkins was operating malfunctioned and caused a spreader bar (a heavy metal beam used by crane operators to pick up large objects), to drop on a cargo container. In a statement to the GPA police, Jenkins reported that "the spreader bar landed hard

---

* Honorable Jose E. Martinez, United States District Judge for the Southern District of Florida, sitting by designation.

on the box," causing a jolt.  Based on Nell's review of Jenkins's statement and video footage of the incident, Nell concluded that the spreader bar did not make a hard landing.  At Nell's request, his assistant managers asked Jenkins to remove any reference in his statement to a hard landing, but Jenkins refused.

In August 2017, Jenkins went to Nell to request weekend leave.  To obtain weekend leave at the GPA, a crane operator must request the date and then also must "secure a benefit," which requires burning—i.e., sacrificing—an additional day of vacation time.  Nell denied Jenkins's request because another crane operator had already asked for the same time off.  However, according to Jenkins, the other crane operator did not secure a benefit until after Jenkins requested and offered to secure his requested time by burning an additional day of vacation.

Jenkins felt as if Nell was mistreating him, but Jenkins feared Nell would retaliate against him if Jenkins went to Human Resources (HR).  According to Jenkins, Nell had a reputation among the crane operators of being a vindictive and bullying boss.  Nell bragged that he was "close with HR" and that he would know if operators went to HR before the operators even left the HR office.  Nevertheless, it is undisputed that despite his fears, Jenkins made an appointment for the following day with an HR employee who he trusted.  Another HR employee emailed Nell to ask if there was anything HR needed to know about for Jenkins's meeting with HR.

Both parties agree that the following evening—the day after Jenkins made his appointment with HR but before he met with

HR—Nell asked to meet with Jenkins before the start of the evening shift. Each party provides a different account as to why the meeting took place and what occurred during the meeting. According to Nell, he called the meeting because he thought that Jenkins was upset about the denial of his weekend leave request. Jenkins disputes Nell's assertion and contends that Nell confronted him because he went to HR earlier that day. Both Jenkins and Nell agree that Nell warned Jenkins to have his facts straight before meeting with HR. Nell then started discussing Jenkins's request for weekend leave, and Jenkins disagreed with how Nell handled it, especially because the other crane operator had not secured a benefit like Jenkins had.

The parties dispute what happened next. According to Jenkins, Nell became visibly upset and angry with wide eyes and quivering lips. Nell then stepped towards Jenkins, and Jenkins told Nell to get out of his face and that he would not be intimated by Nell. According to Nell, Jenkins did tell him to get out of his face and stated that he was at least two feet away from Jenkins.

The following facts are undisputed. When Jenkins proceeded to walk out of the meeting, Nell told Jenkins to go home and then told his assistant managers to take Jenkins off the schedule. After telling Jenkins to meet at HR in the morning, Nell left the facility. Nell emailed HR that night and stated that Jenkins was yelling, being disrespectful, and was aggressive.

Each party provides a different characterization as to Jenkins's behavior after Nell told Jenkins to go home. According to

Nell, when he told Jenkins to go home, Jenkins replied to Nell twice that he was not going home and then proceeded to the breakroom where he told fellow employees that he was being sent home for going to HR and that Nell's conduct was "the kind of thing that is poisoning the department." After leaving the breakroom, Jenkins went outside and spoke with other crane operators and told them that he was being sent home. According to Jenkins, he went to multiple different people to figure out if he was required to clock out before leaving. It is undisputed that Jenkins ultimately left the port and did not work that night.

Jenkins says that when he reported to HR the next morning, he learned that his appointment was canceled, the incident with Nell from the previous night was under review, and he was placed on administrative leave. It is undisputed that HR investigated and interviewed employees who were present on the day of the incident. Jenkins was not given an opportunity to present his side of the story to HR. Additionally, Jenkins believes that during the investigation into the incident, HR mischaracterized and exaggerated his behavior during and after the incident with Nell. HR drafted memoranda to support Nell's version of events that Jenkins was yelling and engaging in aggressive conduct.

Ultimately, HR fired Jenkins for violating Rule A-6 of GPA's Code of Conduct, but Jenkins argues that ground is pretext for Nell's true discriminatory reasons. Rule A-6 provides grounds for termination if an employee fails to carry out a reasonable direct order of a supervisor, engages in insubordinate behavior towards a

supervisor, or demonstrates gross disrespect for supervisor, including verbally or physically threatening a supervisor. Jenkins requested review of his termination, but HR upheld the decision to terminate him.

According to Jenkins, Nell mistreated the white crane operators (including how Nell terminated Jenkins) because he considered them to be his racist enemies. Although Nell did not make racially-biased remarks around Jenkins's termination, two black former GPA employees stated that Nell previously made comments that he believed the white crane operators to be racist and unwilling to work for a black man. One former employee testified that Nell specifically referred to Jenkins and another former crane manager as racists. Both former employees testified that Nell called social meetings of past and present crane operators, the majority of whom were white, as "Klan meetings." Nell disputes these accusations and attempts to discredit the former employees' testimony as retaliation for Nell's involvement in their termination.

In January 2019, Jenkins filed suit in the Southern District of Georgia and alleged that Nell discriminated against him based on race in violation of 42 U.S.C. §§ 1981, 1983.[1] Nell moved for summary judgment because Jenkins failed to provide a proper comparator to establish a prima facie case of race discrimination. In

---

[1] Jenkins also asserted two other claims against Nell. But because Jenkins did not oppose Nell's motion for summary judgment on those claims, the district court granted summary judgment on these two claims in a footnote.

opposition, Jenkins argued that he established a prime facie case of race discrimination and showed that Nell's proffered reason for firing him was pretextual. Jenkins also argued that he presented a convincing mosaic of circumstantial evidence to survive summary judgment.

The district court granted summary judgment to Nell, finding that Jenkins failed to present a prima facie case of race discrimination under either the *McDonnell Douglas* or convincing mosaic frameworks. First, the district court determined that Jenkins failed to present a prima facie case of race discrimination under the *McDonnell Douglas* framework.[2] Specifically, the district court found that Jenkins did not provide proper comparators who were similarly situated in all material aspects to Jenkins. Second, despite finding that Jenkins did not provide a proper comparator, the district court continued to the next steps in the *McDonnell Douglas* framework. Then, the district court found that Nell provided a legitimate, non-discriminatory reason—insubordination—for Jenkins's termination and that Jenkins did not meet his burden to show Nell's proffered reason was pretextual. Last, the district court determined that Jenkins failed to present sufficient circumstantial evidence to establish a convincing mosaic of Nell's intentional discrimination as required to survive summary judgment. Jenkins timely appealed.

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

## II.        STANDARD OF REVIEW

This court reviews de novo the district court's grant of summary judgment, "viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019) (*Lewis II*). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.        ANALYSIS

Jenkins alleged that Nell discriminated against him based on race in violation of 42 U.S.C. § 1981. "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999); 42 U.S.C. § 1981. "The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000).

A plaintiff may use either direct evidence or circumstantial evidence to show race discrimination. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086–87 (11th Cir. 2004), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc) (*Lewis I*). If the plaintiff uses circumstantial evidence to support his discrimination claim, we generally

20-13869              Opinion of the Court                9

apply the *McDonnell Douglas* burden-shifting framework. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174, 1181 (11th Cir. 2010).

Here, because Jenkins uses circumstantial evidence to support his race discrimination claim, he argues that he establishes a claim for race discrimination under the *McDonnell Douglas* framework. Specifically, Jenkins argues that he presented a prima facie case of race discrimination and showed that Nell's proffered reason for Jenkins's termination was pretextual. Alternatively, Jenkins argues that he presented sufficient evidence to establish a convincing mosaic of discrimination to survive summary judgment. We will address each theory in turn.

### a.      *McDonnell Douglas* Framework

Jenkins argues that the district court erred in finding that he failed to establish a prima facie case of race discrimination under the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a prima facie case of race discrimination by demonstrating that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated "similarly situated" employees outside his class more favorably. *Lewis I*, 918 F.3d at 1220–21. To establish the fourth prong, the plaintiff must present evidence of a comparator—someone who is "similarly situated in all material respects." *Id.* at 1224. Although what constitutes a "material" similarity or difference will differ from case

to case, ordinarily a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history. *Id.* at 1227–28.

The district court concluded that Jenkins satisfied the first three prongs for a prima facie case of race discrimination but failed to identify a comparator outside of his class who was treated more favorably.

Jenkins argues that he provided sufficient evidence of three valid comparators: Randy Jones, Brian Jackson, and Michael Saussy, all black crane operators. It is undisputed that all three proposed comparators are crane operators, have Nell as their supervisor, and are subject to GPA's Code of Conduct. Thus, the question of whether Jenkins provided proper comparators turns on whether the three identified comparators committed the same or substantially similar misconduct.

First, Jenkins argues that Jones threatened Nell, which violates Rule A-6 of GPA's Code of Conduct. Despite Jones threatening Nell, Nell did not fire Jones. Second, Jenkins argues that Jackson lied to HR. Although Jackson's conduct did not violate Rule A-6, Jenkins argues that the critical issue is that Jackson went to HR without retribution from Nell (unlike Jenkins) and still has a job. Last, Jenkins argues that Saussy, who made false statements to the GPA police and his supervisors about an investigation into a job site accident, still has a job at GPA.

Jackson and Saussy are not proper comparators because there is no evidence that they engaged in similar misconduct as Jenkins. Jenkins was terminated for failing to follow a supervisor's order in violation of Rule A-6 of the GPA's Code of Conduct. Neither Jackson nor Saussy engaged in similar insubordination or failed to follow direct orders.

Jones is not a proper comparator because the circumstances surrounding his misconduct were not the same or substantially similar as Jenkins. Jones made a comment during a meeting that if he saw Nell outside of the port that he would "whoop [Nell's] ass." Neither party disputes that threatening a supervisor is a Rule A-6 violation. But Jones testified that he made the comment in a joking manner, and, when directed by a supervisor to address his behavior, he apologized and took accountability for his actions. Jones also testified that Nell wanted to fire Jones for the trash talk, but Nell's boss directed Jones to apologize and kept Nell from firing Jones. After reviewing the facts surrounding Jones's Rule A-6 violation, there are substantial differences between what happened with Jones and Jenkins. Thus, Jones is not a proper comparator.

Accordingly, Jenkins failed to provide a proper comparator and did not establish a prime facie case of race discrimination. Thus, the district court properly found that Jenkins failed to show that Nell engaged in race discrimination under the *McDonnell Douglas* framework.

### b.    Convincing Mosaic Framework

Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employees," and (3) pretext. *Lewis II*, 934 F.3d at 1185.

Jenkins argues that even if he did not meet his burden under the *McDonnell Douglas* framework, he presented sufficient evidence to establish a convincing mosaic of discrimination to survive summary judgment. Specifically, Jenkins argues his mosaic includes circumstantial evidence that: (1) Jones committed a Rule A-6 violation (like Jenkins) but remained employed; (2) no less than 18 white crane operators retired, resigned, or transferred from the department since Nell took over; (3) evidence that Nell mistreated three white crane operators; (4) Nell's relationship with HR; (5) Nell's racially-biased comments about white crane operators; (6)

Jenkins declining to change his accident report about a hard landing; and (7) Nell's shifting reasons for terminating Jenkins.

Considering all the evidence, Jenkins provides a convincing mosaic of discrimination, sufficient to survive summary judgment at this stage. Jenkins has met his burden of showing factual disputes that should be decided by a jury—a jury whose role it is to weigh conflicting evidence and make any necessary credibility determinations. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

Although Jones was not a strict comparator, the evidence that he threatened his supervisor, a Rule A-6 violation, and did not incur any additional warnings or discussion about his comments is relevant. *See Lewis II*, 934 F.3d at 1187–88. Nell testified that he does not recall the incident, but Jones's testimony indicates Nell heard the threat. There is a genuine dispute of fact regarding this incident: what Nell heard and how he reacted.

Jenkins's mosaic of circumstantial evidence revolves around credibility findings of not only Nell but other employees who were deposed or provided affidavits in this case. Specifically, the testimony of white crane operators about incidents that caused them to leave the department since Nell took over cuts against Nell's arguments about why the operators left. Although "statistics alone cannot make a case of individual disparate treatment," there are factual discrepancies between the white crane operator's testimony of why they left the department and Nell's explanation for why they left. *Carter v. Three Springs Residential Treatment*, 132 F.3d

635, 642 n.5 (11th Cir. 1998). "Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." *Strickland*, 692 F.3d at 1162.

Next, Nell's racially-biased comments can be circumstantial evidence to support an "inference of discrimination" even if the comments were not made close to the termination decision and were too remote in time or too attenuated to constitute direct evidence of discrimination. *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998). Nell vigorously attempts to discredit the testimony of two black former GPA employees about Nell's comments in referring to white crane operators, including Jenkins, as racists, and social meetings of white crane operators as "Klan meetings." Whether those comments allow an inference of discrimination turns on whether the jury believes Nell or two former employees. *See Strickland*, 692 F.3d at 1162.

When a plaintiff who alleges a racial discrimination claim under Section 1981 or Title VII presents factual and credibility disputes which require a jury to resolve and "would allow a jury to infer intentional discrimination," summary judgment is improper. *Smith*, 644 F.3d at 1328.

## IV.    CONCLUSION

Even though Jenkins failed to show race discrimination under the *McDonnell Douglas* framework, he presented sufficient evidence to meet the convincing mosaic of discrimination standard at the summary judgment stage. Therefore, the district court erred

20-13869                Opinion of the Court                15

in granting Nell's motion for summary judgment.  Thus, the district court's decision is reversed, and the case is remanded for further consideration consistent with this opinion.

**REVERSED AND REMANDED.**